18933

COLONIAL STORES, INCORPORATED, Respondent, v. SOUTH
CAROLINA TAX COMMISSION, Appellant

(168 S. E. (2d) 774)

*Messrs. Daniel R. McLeod, Attorney General,* and *Joe L. Allen, Jr.,* and *G. Lewis Argoe, Jr., Assistant Attorneys General,* of Columbia, *for Appellant,*

*Messrs. McKay, McKay, Black, Sherill, Walker & Wilkins*, of Columbia, *for Respondent,*

June 30, 1969.

BUSSEY, Justice.

The respondent, Colonial Stores, Incorporated, which will be hereinafter referred to simply as Colonial, commenced this action pursuant to the provisions of Sec. 65-2684 of the 1962 Code of Laws for the recovery of certain taxes paid by it to the Appellant, South Carolina Tax Commission. The amount involved is $17,747.41, paid by Colonial, without protest, during the years 1958-1960. While there is some confusion in the record and briefs as to whether the particular taxes involved were sales taxes or use taxes, it appears to us that the amount involved was paid by Colonial and collected by the Commission as use taxes, pursuant to Sections 65-1421, 65-1432 and 65-1448 of the Code. In any event, the record is clear that both parties regarded and treated the taxes in-

volved as being use taxes, at the time of collection and payment.

The case was submitted to the lower court on a stipulation of facts and the Commission appeals from a judgment ordering a refund. During the years in question, Colonial operated a chain of supermarkets in South Carolina and, in order to maintain and increase its business, promulgated a Sav-A-Stamp plan whereby it advertised to the general public that there would be issued free to customers, who purchased regular merchandise, Sav-A-Stamps exchangeable for various items referred to as premium merchandise. Colonial issued and redeemed the stamps itself and was thus a self-redeemer. The stamps were distributed one stamp for each ten cents of regular merchandise purchased. Upon the purchase of $100 worth of merchandise at regular retail prices, whether in a single purchase or a series of purchases, a customer would acquire, if he saved them, stamps worth approximately $1.00, when and if later exchanged for premium merchandise. Upon such exchanges, Colonial did not collect from its customers or pay to the Commission a sales tax.

Customers were not required to accept the stamps and no differential or reduction was made in the price of the regular merchandise when the stamps were not accepted. The expense of Colonial's stamp program, including the cost of the premium merchandise, was carried on Colonial's books and on its profit and loss statement as "trading stamp expense", and was treated the same as other selling expenses and not as a cost of goods sold. The cost of said premium merchandise to Colonial was an expense of its doing business and, like all other costs or expenses of doing business, was reflected in the retail prices charged its customers for food and other items purchased in its supermarkets.

During the period of time here involved, Colonial collected from its customers and paid to the Commission the sales tax imposed by Sec. 65-1401 of the 1962 Code upon the gross proceeds of sales derived from the sale of regular merchandise to its customers. In addition, Colonial, when and as it ex-

changed premium merchandise for Sav-A-Stamps, included in its returns and paid a use tax on the cost to it of the premium merchandise exchanged. This latter is the tax it seeks to recover. That both parties regarded such as a use tax is evidenced by the following stipulation,

"9. That pursuant to the provisions of Sections 65-1448, the plaintiff was authorized by the defendant to purchase the premium merchandise free of the sales tax and to account directly to the defendant for the tax on such merchandise when the same was exchanged for the stamps. The plaintiff sold at retail some of the premium merchandise and exchanged other items for stamps."

Section 65-1448 reads as follows:

"Procedure when segregation of sales and use tax impracticable. Notwithstanding other provisions of this chapter, when in the opinion of the Commission in the nature of a taxpayer's business renders it impracticable or inequitable for the taxpayer to account for the taxes imposed by articles 3 and 4 of this chapter separately, the Commission may issue its certificate to such taxpayer authorizing the sale at wholesale and such taxpayer shall thereupon be accountable for the tax levied by said articles with respect to the gross proceeds of sale of the property withdrawn, used or consumed by such taxpayer for use, consumption or application within this State."

That both parties regarded the premium merchandise as being acquired for use by Colonial rather than for resale and, hence, subject to a use tax is further evidenced by the fact that the tax was paid and collected on the basis of the cost of the premium merchandise to Colonial in accordance with Sec. 65-1421 of the Code, rather than its reasonable market value. A different rule of valuation applies where goods are purchased for resale but later withdrawn from stock and used by the taxpayer. In such case, the withdrawal is, in effect, treated as a sale at retail and the basis of valuation for tax purposes is "the reasonable and fair market

value" of the tangible property withdrawn. See Code Section 65-1353.

For the purpose of Chapter 17, Title 65, the term "use" is defined in Sec. 65-1367, as follows:

"Use. The term 'use' includes the exercise of any right or power over tangible personal property incident to the ownership of that property or by any transaction in which possession is given, except that it shall not include the sale of that property in the regular course of business."

Either the stamps, and consequently the premium merchandise, were given free to its customer as advertised by Colonial, or, if not completely free, the entire Sav-A-Stamp plan was nothing more than an advertising or business promotion plan by Colonial. In either event it would seem to clearly follow that the premium merchandise was not sold "in the regular course of business", but used by Colonial, with the consequence that a use tax was properly collected and paid.

Colonial contends, however, that the premium merchandise was not used by it, but, to the contrary, was actually sold to the customers in connection with the purchase of regular merchandise, because the cost thereof was included in its overall price structure; that a sales tax had already been paid on its entire gross proceeds of sales, and that the imposition of the use tax would result in double taxation, which was not the intent of the legislature in enacting Chapter 17, Title 65 of the 1962 Code of Laws, entitled, "Retail License, Sales and Use Taxes". The lower court found both of these contentions meritorious, but we think it was in error.

The conclusion of the lower court to the effect that the premium merchandise had been previously sold, before being exchanged for the stamps, is predicated in part on decisions of courts of other states dealing with somewhat similar questions, some of which decisions will be hereinafter discussed, and upon Sec. 65-1360 of the 1962 Code of Laws defining the term "sale" for the purpose of Chapter 17, Title 65. The pertinent portion of such section reads as follows:

"Sale.—The term 'sale' includes:

"(1) Any transfer, exchange, or barter, conditional or otherwise, in any manner or by any means whatsoever, of tangible personal property for a consideration."

The Court reasoned that since both gifts and sales involved transfer of tangible personal property, it was necessary to determine whether the transfers of premium merchandise to the customers were made for a consideration. It concluded that there was consideration flowing from the customer to Colonial in the mere act of purchasing groceries and that, additionally, there was consideration in that the cost of the premium merchandise, like all other costs of doing business by Colonial, was reflected in its retail prices for regular merchandise.

For the purpose of this decision we shall assume that there was at least consideration flowing to Colonial for the stamps which were issued in connection with the purchase of regular merchandise. It does not follow, however, that any premium merchandise, as such, was transfered to the customer at the time or times of purchasing regular merchandise. For any tangible personal property to be transferred, it must, we think, be at least identifiable. Upon the purchase of regular merchandise a customer received only stamps which could, after considerable accumulation, be exchanged at some later time for some then identifiable and agreed upon tangible personal property selected from the then available premium merchandise. The stamps as issued were essentially an intangible claim or claims which could later be asserted against Colonial under its Sav-A-Stamp plan.

We thus conclude that the premium merchandise itself was not transferred to the customers in connection with the sale or sales of regular merchandise, but, to the contrary, it was used by Colonial as part and parcel of a business promotion scheme and the use tax paid thereon was properly paid and collected.

The lower court relied on, and the respondent here relies on, several decisions of other courts which, even if in point

factually, would at the most be only persuasive authority. Reliance is had upon the Tennessee case of *Morton Pharmaceuticals, Inc. v. MacFarland,* 212 Tenn. 168, 368 S. W. (2d) 756 (1963). There the taxpayer was a drug manufacturer and wholesaler selling drugs and related items, as well as quantities of non-drug items, to physicians, clinic and hospital customers. In conjunction with its sales of pharmaceuticals, it had two price lists and/or catalogs. Under one catalog, a customer could buy pharmaceuticals at a standard price, but under the other catalog, he could pay a higher price and in connection with the purchase receive premium non-drug merchandise. When customers ordered from the higher price catalog, both the premium merchandise and the pharmaceuticals were delivered to the customer at the same time, and a sales tax paid based upon the higher purchase price. The Tennessee court rejected the contention of the Commissioner that the premium merchandise was subject to a use tax. The case is readily distinguishable on two grounds. The premium merchandise was actually transferred at the same time as the regular merchandise, and the catalogs showed precisely the additional consideration being paid for the premium merchandise at the time of transfer.

Also relied on is the case of *State Tax Commission v. Consumers Market,* 87 Ariz. 376, 351 P. (2d) 654, 80 A. L. R. (2d) 1216 (1960). There the taxpayer, like Colonial here, was a self-redeemer of trading stamps, and the Arizona court did hold that premium merchandise under the facts of that case was sold in connection with the regular merchandise. The case, however, is distinguishable from the instant case. There the Commission sought to levy not a use tax, as here, but a sales tax based upon the exchange of the stamps for the premium merchandise. Of controlling importance in that case, however, was the fact that it was stipulated that all of the merchandise exchanged by the taxpayer was purchased by the taxpayer from its suppliers in the ordinary course of business and *for resale.* In the instant case, the premium merchandise was not bought in the ordinary course of busi-

ness for resale, and in the Arizona case there was no contention that the premium merchandise was subject to a use tax.

It is interesting to note that subsequently and in the same year the Arizona court had before it the case of *State Tax Commission v. Ryan-Evans Drug Stores,* 89 Ariz. 18, 357 P. (2d) 607, 90 A. L. R. (2d) 332 (1960). In this latter case the stamps issued by the taxpayer were redeemable for merchandise through a third party, Sperry & Hutchinson Company of New York, the stamps being known as "S & H Green Stamps". The precise question before the court was whether the taxpayer could deduct the cost of the stamp program from its "gross proceeds of sales" as a cash discount, such question being decided adversely to the taxpayer. While a third party redeemer was there involved, we quote from the opinion of the court the following language, which we think is apropos of the instant situation:

"The obvious fact is that the Company's plan is a promotion scheme designed to induce the public to purchase merchandise * * *."

The fact that the taxpayer here is a self-redeemer does not change, we think, what is the obvious nature of the scheme and the transactions it had pursuant to that scheme.

Most strongly relied on by Colonial and the lower court is the Georgia case in which respondent was also involved, *Colonial Stores, Inc. v. Undercofler,* 223 Ga. 153 S. E. (2d) 549 (1967). In that case four justices of the Georgia Supreme Court concurred in the majority opinion, one justice dissented, and two justices were disqualified, apparently because of previous participation in the case adverse to the contention of Colonial. The majority opinion, as did the lower court in the instant case, placed much emphasis on the consideration flowing from the customer to Colonial at the time of purchase of the regular merchandise, and held that the premium merchandise was sold in connection with the sale of regular merchandise, and, hence, not subject to what is at least the equivalent of a use tax under our statute. We

are not persuaded by the rationale of that decision. On the other hand, while we do not necessarily concur with everything therein said, we are much more impressed with the rationale of the unanimous decision to the contrary of the Georgia Court of Appeals in the same case, reported in *Undercofler v. Colonial Stores, Inc.,* 114 Ga. App. 466, 151 S. E. (2d) 794 (1966).

We now address ourselves to the contention that the imposition of the use tax on the premium merchandise in the instant case results in double taxation. Double taxation arises no more under the facts of the instant case than it does upon the taxation of any other items purchased by Colonial and used by it like the premium merchandise here, in the conduct of its business. Moreover, Colonial has actually paid no tax upon this premium merchandise other than the use tax which it seeks to recover. Any sales tax paid upon its gross proceeds of sale resulting from the inclusion of the cost of its Sav-A-Stamp plan and premium merchandise in its retail prices was actually paid by its customers and not by Colonial. Of course, Colonial was liable to the State for the collection and payment of such sales tax, but the economic burden thereof fell upon the customers, Colonial being required as a matter of law to collect such from its customers. See Sec. 65-1427, 1962 Code of Laws.

Our conclusion that Colonial is entitled to no refund makes it unnecessary to pass upon the other questions raised by the appeal.

The judgment of the lower court is reversed and the case remanded for entry of judgment in favor of the appellant.

Reversed and remanded.

Moss, C. J., and LEWIS, BRAILSFORD and LITTLEJOHN, JJ., concur.